HERKIMER, Administrator, *et al., v.* RICE *et al.*

The administrator of an insolvent estate has an insurable interest in buildings belonging to it.

The right of creditors to resort to a sale of real estate of the decedent for the payment of debts gives them such an interest therein as to support an insurance,.and when made by the administrator it is for their benefit, so far as required to pay the debts of the estate.

If the insurance moneys exceed the amount of the debts, the administrator holds them, *it seems,* in trust for the heirs.

The renewal of a fire policy held to be made by and with the administrator, and not by the heirs, where the premium was paid by the direction of the administrator and by his agent, who was also the guardian of the heirs; the renewal receipt stating the money to have been received "from the estate" of the decedent, and the guardian, who had sufficient funds both of the administrator and of the heirs, having paid the premium out of the latter, and charged it to the heirs in his accounts.

Where the insurance is effected by the heirs after the death of their ancestor, it is, *it seems,* for their benefit solely, notwithstanding the defeasible nature of their estate in consequence of its liability to sale for the ancestor's debts: *Per* DENIO, Ch. J.

ACTION to obtain the direction of the Supreme Court respecting the disposition to be made of a sum of $7,068.46, which had been paid into the hands of the defendant Brainard, as surrogate of the county of Kings, being the proceeds of certain policies of insurance upon buildings formerly belonging to John Rice, deceased; which money the plaintiff Herkimer, his administrator, who was also a creditor of his estate, claimed to be distributable among his creditors. Sheppard, the other plaintiff, was likewise a creditor. The defendants, besides the surrogate, were five infants, the children and heirs-at-law of John Rice, and their general guardian, Seymour Tracy. John Rice, late of Brooklyn, died in September, 1856, intestate, and seised of real estate in the county of Yates, on which were situated certain mills, which, in his lifetime, he had caused to be insured against fire. The policies, three in number, in as many differ-

ent insurance companies, and for sums amounting together to $7,500, were in force at the time of his death, but expired early the next year. They were all once renewed by the agents of the companies, residing at Penn Yan, by renewal receipts stating the premium to have been received from the estate of John Rice, deceased. At the expiration of the periods mentioned in these receipts, two of the policies were again renewed by receipts given by said agents — one of these last receipts stating the premium to have been received from the estate of the deceased, and the other that it was received from Seymour Tracy. Said Seymour Tracy, after the death of Rice, obtained an additional original policy on the mills for $1,000, in which " George Herkimer, administrator of the estate of John Rice, deceased," was named as the party insured. When this policy was about to expire, it was renewed, on the application of Tracy, pursuant to instructions from Herkimer, the administrator, the receipt stating the premium to have been paid by said Tracy. It was during the running of the last-mentioned renewals that the insured premises were destroyed by fire, namely, on the 3d day of April, 1858.

Seymour Tracy, the person mentioned above, resided at Penn Yan, and had been the agent of the deceased, in regard to his business in Yates county, for several years before his death; and after that, he became the agent of the administrator, whose residence was at Brooklyn, and in the character of agent collected debts, disposed of personal property, and performed various services relating to the estate, and always had moneys of the estate in his hands sufficient to pay the premiums of insurance on the aforesaid renewals. Several letters from the administrator to Tracy were given in evidence, and both of those persons were examined as witnesses on the trial. The judge before whom the trial took place found, as matters of fact, that the administrator instructed said agent to renew the policies, on their being about to expire, and " that he did renew the same from time to time in pursuance of such instructions and for said administrator; the agent retaining the policies and giving no notice to the administrator, of the same

being other than for his benefit as administrator." But said Tracy, during all these transactions, was the general guardian of the defendants, who were the infant children and heirs of the deceased. The money which he paid to obtain the said renewals, and for the premium and expenses of the additional policy which he effected, was the money of the said infant children, in his hands as their guardian, and he charged the same in the accounts which he kept with them as such guardian.

After the loss, the said Tracy made out and furnished to the respective insurance companies proofs of loss, in his name as general guardian, claiming therein that the insurance moneys belonged to said children. The companies thereupon paid it to him, taking his receipt signed as their general guardian; and he deposited the same in a bank to his credit as such guardian, where it remained until it was paid over to the surrogate as afterwards mentioned.

The estate of John Rice was, in fact, insolvent; and it was believed by the administrator to be so at the time the said renewals of the policies of insurance were made. He fully administered the personal estate, and subsequently, and after the destruction of the insured buildings, he applied to the surrogate of Kings county and obtained an order for the sale of all the real estate of the intestate; and the same, embracing the land upon which the insured buildings had stood, was accordingly sold, and the proceeds applied to the payment of the debts, leaving debts still unpaid to an amount exceeding the aforesaid insurance moneys. The administrator thereupon applied to said Tracy to pay the said moneys into the hands of said surrogate, but he declining to do so, the administrator, on an affidavit stating the material facts, and on notice to Tracy, applied to the surrogate for an order requiring him so to pay them. An order to that effect was made by the surrogate, and Tracy accordingly paid the moneys, after deducting the amounts he had paid for premiums and the expenses of collecting the amounts, into the hands of the surrogate. That officer entertaining doubts as to his duty respecting the disposition of said moneys, this action was brought to determine to

whom the same belong. The creditors of the estate were alleged to be very numerous, so that it was impracticable to bring them all before the court, and the plaintiffs therefore sued for the benefit of all those creditors as well as on their own behalf.

The Supreme Court gave judgment to the effect that, after the payment of the costs of the several parties and the commissions of the administrator, the residue of the fund, and all interest which had accumulated thereon, should be distributed and paid to the creditors of the testator in the same manner as though the same were the proceeds of his real estate sold under an order of the surrogate, according to the statute. The defendants Tracy and the infants by their guardian *ad litem* appealed.

The case was submitted on printed arguments by

*D. B. Prosser* and *S. H. Welles*, for the appellants; and was argued orally by

*Charles Tracy*, for the respondents.

DENIO, Ch. J. The counsel for the administrator and the creditors maintains that, though it should be considered that the contracts of insurance which were in force at the time of the loss were effected by, and were the property of, the heirs, the insurance moneys should still, in consequence of the events which have happened, be applied towards the payment of the debts of the intestate. These moneys, it is argued, are a substitute for so much of the real estate as had been destroyed by fire; and inasmuch as the whole real estate would have been chargeable with the debts if no accident had happened, the conversion of a part of it into money by that fortuitous circumstance ought not to exempt it from the charge to which the law had subjected it. This would plainly have been the result if the contract of indemnity had been made by the deceased in his lifetime, as was held in the case of *Wyman* v. *Wyman* (26 N. Y., 253). In that case the fire occurred before the expiration of the policy which had been effected by the deceased; and it was decided that the indemnity took the

place of the real estate, and belonged to the heirs, subject to the charges which would have existed against it in their hands. But when the land vests in the heirs by the death of the ancestor, they do not owe any duty to the creditors to insure the buildings against accidental injury from the elements; and if they do contract with others for an indemnity against such accidents, and pay the consideration for such a contract, and the contingency happens, the promised indemnity belongs to them, and not to the creditors, who are strangers to the contract. If the defeasible nature of the estate of the heirs, on account of the existence of debts owing by the ancestor, were known to the insurers, it is to be supposed that they would only insure a sum commensurate with the limited interest of the heirs. But whether the amount insured is so actually measured or not, the interest at risk and for which the indemnity is promised, supposing the policies to have been effected by the heirs, is their estate, and not that of parties holding paramount rights, capable of being enforced in such a manner as to divest the title of the heirs and to create a title in some other person. It is not alleged that the debts of the deceased were other than such as arose upon simple contracts. Such debts were not a charge upon the heirs at common law. The heirs in this case were not liable to be prosecuted in any way for the debts of their ancestor in respect to the real estate which descended to them, until a period subsequent to the expiration of the insurance which produced the fund in controversy (2 R. S., p. 109, § 53), and if a suit against them had been prosecuted to judgment at the earliest period at which it could have been done, and the land, not having been sold in the meantime under the surrogate's order, had been seized on execution (and that would have been the only subject which could be levied on), the creditors, or the purchaser under their process, would have acquired the property in its then existing state, without any possibility of being indemnified for the loss occasioned by the antecedent fire. (2 R. S., p. 456, § 47.) So, by resorting to the statutory proceeding for a sale under a surrogate's order, as was actually done, the land must of course

be sold in the condition in which it is found when the sale takes place; and a prior loss from an accidental fire must be borne by the creditors and not by the heirs who had enjoyed it from the testator's death to the time of the sale. These considerations seem to me, to show that if the heirs insure, during the continuance of their title and enjoyment, the insurance is upon their interest and for their benefit solely, and that neither the creditors nor the executors or administrators, who represent them, have any privity with or interest in the contract of insurance. The relation between the heirs and the creditors of their ancestor, in respect to the land descended, bears a general resemblance to that which exists between mortgagor and mortgagee, though it is less intimate, as the heirs are not personally liable for the debt, while a mortgagor is generally personally bound; yet it is well settled, that if a mortgagor insure the mortgaged premises, without any contract with the mortgagee binding him to do so, he is entitled to receive the insurance money, in case of a loss, to his own use, and the mortgagee has no lien upon it. (*Carter* v. *N. Y. Ins. Co.*, 8 Paige, 437). I am, therefore, unable to sustain the judgment of the Supreme Court on the reasoning upon which it was placed by the general term. It was there assumed that the contracts of insurance were made by the heirs with the insurance companies, and that the administrator had no such insurable interest as would warrant a policy in his name for the benefit of the creditors. It was considered that money received by the heirs upon a policy effected by them, was of a similar nature to money expended by them for repairs; and as the latter, in case of a sale of the land to pay the debts, would inure to the benefit of the creditors, so, it was thought, the insurance money should be applied towards the satisfaction of the debts. But repairs become parcel of the real estate to which they are annexed, and it is because they cannot be separated from that of which they have thus become a part, that they go to the purchaser upon a sale of the land. It was likewise thought that it would be contrary to public policy to permit heirs, whose estate was liable to be sold for

the benefit of the creditors of their ancestor, to effect an insurance wholly for their own benefit, as it would hold out an inducement to over insurance and might lead to fraudulent losses. But the argument proves too much, as it would forbid parties having a limited or defeasible interest in lands and buildings from effecting insurance on the latter, except on condition of holding the insurance moneys, in case of a loss, for the benefit of parties having liens or future interests in the premises. The law only requires that the assured shall have an insurable interest in the premises of which insurance is sought; and the principle that a recovery can only be had for the actual loss, and the consideration that the interested vigilance of the insurers will generally prevent an over payment or an excessive valuation, have been considered a sufficient protection against fraudulent insurances.

The administrator and the creditors must, therefore, in this case, in order to sustain the judgment which has been rendered in their favor, maintain the affirmative of these two propositions : first, that the contracts of insurance, which were in force at the time of the loss, were made by the administrator with the insurance companies for the benefit of the creditors ; and secondly, that the administrator had such an insurable interest in the buildings as to enable him to make such contracts. The counsel for the creditors has suggested that the last position is not necessary to be established, because the insurance companies voluntarily paid the amount of the loss, and the depositary of the moneys, it is argued, cannot set up an objection which the parties, who alone were interested in it, have waived. But the insurers paid the money, upon the claim of the heirs, into the hands of their general guardian, and did not by that act in any way recognize the rights of the administrator or of the creditors. If the policies or contracts with the administrator were void for the want of an insurable interest in him, the creditors are not entitled to the money, and though the heirs might not have been able to collect it from the companies because the contract was not with them, the administrator and the creditors cannot impeach their right

to retain it, since it has been voluntarily paid to them, except by showing their own title to it, and this they can only do by establishing a contract with the administrators for their benefit, and that such contract was valid in law.

1. I feel no difficulty in holding that, upon the facts found, the contracts made with the insurance companies were those of the administrator, and not of the heirs or their general guardian. In form they are the contracts of the administrator. The policies, except the one obtained after the death of the intestate, were made with the deceased in his lifetime as the insured party, and ran to him and his personal representatives and assigns. They were all renewed once, and in each instance the premium for the continuance of the risk for the ensuing year is stated to have been received by the companies from "the *estate* of John Rice, deceased." In common parlance, as well as in legal language, the estate of a deceased person who has died intestate is his effects held in trust by his executors or administrators. The lands which the heirs take by descent, in the case of an intestacy, are held in their own right as owners, and are no part of any trust estate. When persons so entitled effect insurance, or make other contracts respecting the property, it is, if correctly done, in their own name as owners. In these first renewals, neither the name of the heirs nor of their guardian, in his individual name or the name of his office, is mentioned. But the *estate* is named as the contracting party; and this, in my opinion, means the administrator. The loss did not occur during the time covered by these renewals, but the policies were renewed again for a period during which the buildings were burned. In one or more of these second renewals the premium is stated to have been paid by Seymour Tracy, without any designation of the character in which he made the payment. As the contract of the companies is stated to be a renewal, it must be intended to be a continuation of the agreement which had existed up to that time, and to be between the same parties, unless a contrary intention appears in the instrument. There is the same absence of any allusion to the heirs or their guardian, as such, as in

the first renewals. The name of Tracy is inserted as the person making the payment; but as he, on behalf of the estate, effected the first renewals with the agents of the companies, and as no notice is shown to have been given that he acted in any different character on the last occasion, there is no ground for inferring from the language of the receipts that any change of parties was intended. In one of the second renewal receipts, the same language as to the party paying the premium is used as in the first renewals. As to the original policy taken out in the name of Herkimer, as administrator, there is no pretence for saying that it was the contract of the heirs or of their guardian; and the renewal of that policy does not indicate that there was any change as to the party in whose favor the insurance was continued. In addition to the language of the policies and the receipts, we have the fact that Mr. Tracy was, during all this time, acting as the agent of the administrator in the county in which the property was situated, and had in his hands the funds of the estate sufficient to pay the premiums; and the further very important facts, found by the judge, that all these renewals were effected by him in pursuance of instructions from the administrator and for him, and that he never informed the administrator that he intended to intervene in behalf of the infant heirs. The only circumstance militating in any way against the conclusion to which the foregoing considerations would lead is, that Tracy, as general guardian, charged the money paid for premiums in his accounts with his wards. But it does not appear that, at that time, he knew or had any suspicion that the estate of the deceased was insolvent. If it were not insolvent, and if the personal property were adequate to the payment of the debts, it would be quite proper that the heirs should be at the expense of procuring a contract for indemnity against the risk of the buildings being consumed by fire. It may have been that the accounts were kept under some such idea. All that is certainly shown is, that the contracts are such as would have been made by an administrator who intended to provide an indemnity against loss by fire to property to which the creditors would be ob-

liged to resort for the payment of their debts, and that these contracts were entered into by his agent under express instructions for that purpose. It follows that they were the contracts of the administrator, made for the benefit of the creditors, if he were capable in law of making such contracts.

2. But the more important as well as more difficult question remains, whether an administrator of an insolvent estate has such an insurable interest in buildings situated upon the land of the deceased, as will enable him to effect an insurance against loss by fire. It will be convenient to consider in the first place whether the creditors themselves have such an interest, and then, whether the administrator can be said to represent that interest, so as to enable him to make the contract for the benefit of the creditors. It is certain that the creditors had no estate whatever in the real property. In a technical sense, they had no lien. But they had important rights connected with it, and a pecuniary interest in its preservation. By an application to the surrogate, made in their behalf by the administrator, or, in default of that, by themselves personally, they could require loans upon it, or leases of it to be made, or that it should be sold and the proceeds be applied to the satisfaction of their debts; or, if three years should pass by without such application, they could prosecute the heirs and subject it to a sale by means of the execution in such action, or if the heirs had alienated it, they could claim of them its value. (2 R. S., p. 452, § 32, *et seq.;* p. 100, § 1, *et seq.,* § 48, *et seq.*) In the absence of personal assets, this right of resort to the land would afford the only means of obtaining payment. By supposing an extreme, but by no means an improbable case, we shall have a more distinct idea of the nature of this right. There may be a single creditor to whom a large debt is owing by one who has died intestate, without leaving personal property, but seised of adequate real estate whose principal value consists of the erections upon it. If he cannot insure these structures against loss by fire, either directly, or through some legal agency or representation, he is deprived of a mode of protecting himself

which the law generally affords to all persons having pecuniary interests in buildings to protect. His interest, for all substantial purposes, is the same with that of a mortgagee, who may always insure the property mortgaged to protect the mortgage debt. The difference between the cases is technical merely. The mortgagee has a specific lien, and, by the ancient theory of the instrument, he had an estate defeasible by the performance of a condition. But the law of insurance is of modern growth, and is based upon motives of general policy and of individual convenience, rather than upon artificial reasons. The law does not require that the assured should have an estate or a property in the subject of the insurance. It is sufficient that he have a direct pecuniary interest in its preservation. This is established by numerous examples where questions of insurable interest have been passed upon by the courts. Some of the English cases which will be referred to being such as arise upon marine policies, it is necessary to say that the law respecting insurable interest is the same as in fire insurance. This was formerly doubted, but since the statute of 19 George II (ch. 37), which, in effect, prohibits gambling policies, no one can contract for an indemnity against a marine risk unless he have an interest in the subject insured. The law as to insurable interest was elaborately examined in the case of *Craufurd* v. *Hunter*, in the King's Bench, the Exchequer Chamber and in the House of Lords. (8 Term, 13; 3 Bos. & Pul., 75; 2 B. & P., New Rep., 269. In the last two books the name is *Lucena* v. *Craufurd*.) The action was on a marine policy upon several vessels and their cargoes, on a voyage from St. Helena to a port in Great Britain. The plaintiffs were commissioners appointed by the Crown pursuant to an act of Parliament and to certain orders in council; and their general duty was to take into their possession and under their care all ships and cargoes which should be brought into the kingdom pursuant to the act of Parliament and orders referred to, and to manage, sell and dispose of the same to the best advantage, according to such instructions as they should, from time to time, receive from the

Crown. The case was, that the French Republic had, in the year 1795, invaded Holland, then on terms of friendship with Great Britain, with a view to revolutionize the government and make it a party, in the French interest, to the war which France was then waging with the principal European States. The course of the British Government was to seize upon all the Dutch vessels which their cruisers could find at sea, and to bring them into a British port, to await such disposition of them as the course of events in Holland and the policy of the British Government should require; it being assumed that the Dutch merchants and a part of the population were favorable to England and its allies and hostile to the French, but that the government of that country might be coerced to join France in the war. The act of Parliament and the orders in council established that policy, and the plaintiffs were appointed to deal with the captured vessels upon their arrival at a British port; but it was not contended that they had any concern with them until such arrival. The ships insured, eight in number, were captured pursuant to this system, and the commissioners, on receiving advices that they had sailed from St. Helena for England, effected the policy sued on; and, several of them being lost on the voyage by the perils of the sea, the action was brought against the underwriters to recover the amounts insured. The only material question was, whether the plaintiffs had an insurable interest. The King's Bench gave judgment for the plaintiffs, holding that they had such an interest as trustees of the parties who might eventually be interested, likening the case to that of trustees, consignees and agents for prizes. On error to the Exchequer Chamber, this judgment was affirmed, after three arguments, by eight judges against CHAMBRE, J., who dissented. The principal objection to the recovery related to the doubtful and contingent nature of the interests represented by the commissioners, who had no concern with the ships until they should arrive; and it was argued that they might be prevented from arriving in a condition to be subject to the control of the commissioners, by various causes, independent of the perils insured

Herkimer v. Rice.

against. They might be given up by the government, or they might vest provisionally in the Crown by the occurrence of a state of war between England and the States of Holland, in either of which cases the agency of the commissioners, it was argued, would not attach. In the opinion, concurred in by a majority of the judges, the rule was stated which they said had been laid down by the counsel for the commissioners, and that no exception had been suggested to it, viz.: "that where nothing intervenes between the subject insured and the possession of it, but the perils insured against, the person so situated may insure the arrival of such subject of insurance, for he has an interest to avert the perils insured against." The opinion of the dissenting judge went upon the ground that the commissioners had no power of disposition for the benefit of any one, except under the discretionary direction of the privy council, and that it could not be ascertained until such orders were received who were the beneficiaries of the trust confided to those officers. But the learned judge admitted the rule as to interest to be sufficiently broad to cover the rights of the creditors in the present case. "There appears to me," he said, " to have been great propriety in establishing the contract of insurance, whenever the interest declared upon was, in the common understanding of mankind, a real interest in, or arising out of the thing insured, *or so connected with it as to depend on the safety of the thing insured and the risk insured against*, without much regard to technical distinctions respecting property ; still, however, excluding mere speculations or expectation, or interests created no otherwise than by gaming." When the case came before the House of Lords, the twelve judges were called upon to answer certain questions, and principally whether the commissioners had an insurable interest. Eight judges, including Sir JAMES MANSFIELD, Chief Justice of the Common Pleas, were of opinion with the plaintiffs, and two, CHAMBRE and LAURENCE, thought the interest too uncertain to be the subject of an insurance. In the answer of CHAMBRE, J., he said there was no other foundation for the claim of interest than a mere naked expectation of acquiring

a trust or charge respecting the property, without a *scintilla* of present right, either absolute or contingent, in possession, reversion or expectancy, in the proper legal sense of the word; that if they could insure these vessels, they could insure any ships belonging to the Provinces of Holland which were out at sea. He contended that the destination of the insured vessels for a British port might be changed at any time at the pleasure of the King; that he might give them up to the Dutch owners, and that the property might be changed by the commencement of hostilities with the Dutch Government. Hence, he thought the supposed interest altogether too vague and uncertain. In the answer of LAURENCE, J., who dissented from the majority, on nearly the same grounds, he undertook to state the nature of a contract of insurance, which, he said, was to protect men against uncertain events which might be in any wise of disadvantage to them, " not only these persons to whom positive loss may arise by such events occasioning the deprivation *of that which they may possess*, but *those also* who, in consequence of such events, *may have intercepted from them the advantage or profit*, which, but for such events, they would acquire according to the ordinary and probable course of things." On these grounds he thought a contract of insurance might extend to protect every kind of interest that might subsist in, or be dependent upon, things exposed to the dangers to which maritime ventures were subjected. Lord Chancellor ELDON advised the award of a *venire de novo*, on nearly the same grounds as these relied on by the dissenting judges, namely, the uncertainty whether, independently of the perils of the sea, the vessels would ever have come within the jurisdiction of the plaintiffs as commissioners. He said that it was competent for the Crown, from the moment the vessels were captured by the British cruisers, to restore them to the Dutch owners, or to the Dutch Government, or to deal with them in any manner which should be thought fit, and that the power of the commissioners never attached till they actually came into a British port. He, however, suggested that it might be shown on another trial that the insurance

was directed by the Crown, which would obviate some of the difficulties which he felt. In the course of his long opinion, he said he was unable to define an insurable interest, which he considered to be something between a certainty and an expectation, " unless," he said, " it be a right in the property, or a right derivable out of some contract about the property which, in either case, may be lost upon some contingency affecting the possession or enjoyment of the property." Lord ELLENBOROUGH and Lord ERSKINE concurring with Lord ELDON, a new trial was awarded, when, as the reporters state, the plaintiffs again recovered upon the interest of the King. I have remarked at some length upon this case, because it is the only one I have been able to find in which the question of insurable interest was considered upon principle, and because it underwent an examination of unusual thoroughness and ability. The decision, if any can be said to have been made, is of less importance than the statement of the principles upon which the question of interest depends, which statement seems to have been concurred in by all the eminent judges who took part in the discussion. The interest of the creditors, in the present case, would be sufficient to support a contract of insurance, according to the views of all the judges. No property in the thing insured is required. It is enough if the assured is so situated as to be liable to loss, if it be destroyed by the perils insured against. Creditors having no other means of enforcing their debts, but having a direct and certain right to subject the real estate to a sale for their benefit, have an interest as positive and absolute as one having a specific lien, or even as the owner himself. It is not at all in the nature of an expectation, such as a presumptive heir has in the estate of his ancestor, which may be cut off by an alienation, a will, or by his own death. Lord ELDON, indeed, suggests that the interest should be derivable out of some contract about the property insured, but it is plainly the same thing, if the arrangements which the law makes place the assured in a position where he must inevitably suffer loss, if the property is injured by the perils against which the insur

ance is intended to protect him. It is well settled that insurers may reinsure the same property, yet they have no estate in or lien upon it. (*Brown* v. *Curtiss*, 2 Comst., 225.) So of the lender of money upon bottomry and *respondentia*. (1 Phil. on Ins., 111.) So also of the interest of a supercargo, who by contract is to be paid out of the proceeds of the cargo upon its arrival at the port of destination; of parties entitled to freight on the arrival of the vessel, and the like.

I do not, therefore, doubt in the least that these creditors were entitled to insure the buildings standing upon the land of their deceased debtor. Their recovery, if they had effected the insurance and had been compelled to sue the insurance companies, would no doubt have been limited by the amount of their debts, and if such suit had been brought before the sale of the land, they might have been compelled to assign their demands to the insurers, in analogy to the case of a mortgagee effecting insurance upon the buildings covered by the mortgage. But these questions do not arise here, as it appears that the land has been sold, and the unpaid residue of the debts exceeds the whole amount of the insurance money.

There is no doubt that an executor or administrator may effect an insurance of the personal chattels of the deceased whom they represent. The title to such property vests in the personal representatives; but it is quite different with the land which descends to the heirs; and, if they have a right to effect an insurance upon the buildings, it results from the power which they possess of mortgaging, leasing or selling it under an order of the surrogate pursuant to the statute. That it is highly convenient that they should possess that power, no one will deny. As the parties to whom the creditors must resort, in the first instance, they necessarily became accurately informed as to the amount of the indebtedness of the deceased, and, having also the title to and possession of the personal assets, they are the first to know whether the real estate of which he died seised will have to be resorted to. Then the creditors of an insolvent estate are generally numerous, and

Herkimer *v.* Rice.

.having no opportunity for concerted action, except through the executor or administrator, they could scarcely ever avail themselves of the advantage of insurance unless by the agency of these representatives. Then the executors and administrators, under our statutes, have a certain connection with the real property. They have no estate, it is true, but this we have seen is not necessary to the existence of an insurable interest. They have no power to sell without the order of the surrogate; but if the estate be insolvent, they have a right to apply for such an order, and it is a matter of course to grant the order to lease, mortgage, or sell. It is material to the value of this power, and to the objects contemplated by the statutes, that the estate should be protected from injury in the interim, and until the proceeding can be perfected; and where the value consists to any extent in combustible structures, the known and universal method of obtaining such protection is by an insurance against the hazard of fire. If the administrator cannot insure, the parties interested, the creditors, will be excluded from a remedy which, all other persons having a similar interest, possess. They have no power to guard against accidents by care and watchfulness, for the custody and possession is not in them but in the heirs. There are many cases in which an agent or trustee may insure the interest of the party beneficially interested. Mr. Angel lays it down that one may insure, in his own name, the property of another for the benefit of the owner, without the latter's previous authority or sanction, and that it will inure to the interest of the party intended to be protected upon a subsequent adoption of it even after a loss has occurred. (Angel on Life and Fire Ins., § 79.) The case of *Deforest* v. *The Fulton Fire Insurance Company* (1 Hall's Superior Court Rep., 84), is very strong to the same effect. A commission merchant took out a policy upon goods which might be in a certain store, as well the property of the assured, as held by him in trust or on commission, and it was held that the whole value of the goods held on commission, and not merely the interest of the party named in the policy, was covered. The

nominal insured had a special property as bailee which he. was entitled to insure upon common principles, but the case necessarily decides that he could further insure, as trustee for the owner, the interest of such owner.  It may be said that the administrator was not the trustee of the land, and that is true.  But he was the trustee of a power over it, and such a trust is one recognized by law.  The case of *Lucena* v. *Craufurd*, already referred to for another purpose, contains repeated *dicta* of the judges to the effect that an agent or trustee may insure the interest of his principal, and the decision itself is an adjudication upon this very point, for a new trial was ordered to enable the plaintiffs to recover the value of the interest of the Crown, who was not named as a party to the contract, and a recovery for that interest was subsequently had.  In this case it was sufficiently apparent, from the language of the receipts for premium, that it was the interest of the creditors which was designed to be covered by the contract.  The insurance being in the name of the estate, that is, as has been shown, of the administrator, it would be apparent that the beneficiaries of the administrators were the parties intended to be protected.  These could not embrace the administrator personally, for as such he had no interest in the land.  It could not embrace the heirs, for they could take nothing through or under the administrator, except subject to the payment of the debts; and the next of kin, as distributees, could have no interest as such in the real estate.  The insurers must, therefore, have seen and known from the terms of the contract, that it was the interest of the creditors, arising out of their power to subject the real estate to the payment of their debts, through the legal agency of the administrator, which it was the object of the policy to protect, and that such interest of the creditors was the subject of the contract which they entered into.

It is not necessary to decide to whom the surplus of the moneys would have belonged, if the fund had exceeded the amount of the debts.  The effect of the judgment in the case of *Wyman* v. *Wyman* would probably be, that such surplus

belonged to the heirs as a substitute for the real estate, and that, so far as the indemnity was not needed for the payment of the debts, it was a trust for the heirs. It is true, the administrator was not a representative of the heirs; but the companies agreed to insure a certain amount on the buildings, and after the loss, they voluntarily paid it. So far as it was not needed to pay debts, it was a trust for some parties. The distributees, under the statute of distributions, do not always take the same shares in the residue of the personal estate as the heirs do in the real. In such a case, where there was such a surplus as I have supposed, the question would be whether that surplus should be considered general assets, or a part of the realty accidentally converted into money; and I should suppose it ought to be considered as of the latter character. Such seems to have been the opinion of the Master of the Rolls in *Parry* v. *Ashley* (3 Simons, 97.) There the owner of real estate took out a policy on a building, which was running at his death, and was renewed by his executrix, was also legatee and devisee of his real and personal estate, which was, however, charged with an annuity to his widow. The building was burned, and on a bill by the annuitant, the money was ordered to be brought into court, to await further directions, the vice-chancellor saying that he thought it could not be considered as part of the testator's general personal estate, but that it was affected with a trust for the benefit of the parties interested in the real estate. That case, moreover, decidedly favors the conclusion to which I have arrived in the present case. The creditors, whether by simple contract or by specialty, under our laws, are parties interested in the real estate where there is a deficiency in the personal, for they have the power to subject it to the payment of their debts. Their interest in it is of the same nature as that of the annuitant in the case cited.

It follows, that the payment of the insurance moneys to the general guardian of the infant heirs was a mistaken payment, which would not have protected the insurers against the claims of the creditors, or of the administrator as their repre-

sentative. But as the money has been kept separate from all other moneys, and is in the hands of the surrogate, he may be regarded in the light of a receiver; and though the order made by himself, under which the money was paid to him, had no intrinsic validity, it was quite correct that he should be directed to distribute it upon the principles stated in the judgment of the Supreme Court.

Hence, I am of opinion that the judgment appealed from should be affirmed.

All the judges concurring,

Judgment affirmed.